UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY HILL,

        Plaintiff,

v.

OAK STREET HEALTH MSO LLC,

        Defendant.
_____/

Case No. 2:22-cv-10684

Honorable Susan K. DeClercq
United States District Judge

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 46) AND DISMISSING COUNTS V AND VI OF PLAINTIFF'S COMPLAINT (ECF No. 1)**

Plaintiff Timothy Hill, who worked to enroll new patients for a clinic run by Defendant Oak Street Health MSO LLC (OSH), was unhappy with the workplace dynamics and practices at the OSH clinic. According to Hill, the clinic's practices created obstacles that made it difficult for him and other employees to perform their jobs well. So, he reported his dissatisfaction to several supervisors and the human resources department and requested to transfer to a different clinic location. But management pushed Hill's complaints aside. Hill then continued to struggle with job performance until he was eventually terminated in September 2020.

In 2022, Hill sued OSH for sex and race discrimination, a hostile work environment on the basis of sex, and retaliation. Now before the Court is OSH's

motion for summary judgment seeking dismissal of Hill's two remaining retaliation claims under state and federal law. As explained below, OSH's motion will be granted because there is no question of fact that those involved in deciding to fire Plaintiff had no knowledge of the only complaint that qualifies as a protected activity sufficient to establish a prima facie case of retaliation.

## I. BACKGROUND

### A. Factual History

In January 2019, Defendant OSH,[1] hired Plaintiff Timothy Hill—a Black man—as one of four outreach associates for its Cherry Hill location in Dearborn Heights, Michigan. *See* ECF No. 46-2 at PageID.353–54, 359; *see also* ECF No. 1 at PageID.1. As an outreach associate, Hill worked to solicit new patients for Cherry Hill under the supervision of the outreach director. *See* ECF No. 46-2 at PageID.527, 497–98 To accomplish this goal, Hill (and other outreach associates) were required to "attend[] and/or run[] events to meet with seniors, their adult children, and community influencers to meet prospective patients and to schedule their initial welcome visit appointment with [OHS]." *Id.* If an outreach coordinator did not schedule a target number of welcome visit appointments for three months in a row,

---

[1] Oak Street Health is "company of community-based healthcare centers." ECF No. 46-2 at PageID.527. These centers provide "holistic, comprehensive and integrated care" to adults on Medicare in medically underserved communities. *See* ECF No. 46-2 at PageID.527.

that outreach associate risked termination. *Id.* at PageID.358–59. At OSH's Cherry Hill location, the outreach associates were expected to schedule somewhere between 15–20 new welcome visits each month. *See id.* at PageID.511 (testifying that the target number was 15); *see also id.* at PageID.620–22 (testifying that the target number fluctuated between 15–20).

In June 2019, Brandon Young became the Outreach Director at Cherry Hill, making him Hill's new supervisor. *See id.* at PageID.353, 498. As Hill's supervisor, Young was responsible for overseeing the outreach associates and "mak[ing] sure that [the] outreach associates were getting leads for the center" and bringing in new patients. *Id.* at PageID.498.

Near the end of 2019, Hill's welcome visit numbers started to fall. Hill failed to meet his target number of welcome visits in November and December 2019, scheduling only nine welcome visits in November and only eight in December. *See* ECF Nos. 46 at PageID.315; 46-2 at PageID.551 (declaring that the chart in OSH's motion for summary judgment reflects figures "collected from OSH's business records" that were provided to Hill during discovery).

On January 24, 2020, Hill was working in the clinic when a "white homeless man" entered the clinic. ECF No. 46-2 at PageID.539. According to Hill, the man was not a patient but "came regularly into [Cherry Hill's building]" to "drink most of the coffee and sit on the floor and rock back and forth." *Id.* Because his sitting on

the floor made people feel "uneasy," Cherry Hill employees had recently begun asking the man to sit in a chair instead. *Id.* Usually, according to Hill, when Cherry Hill employees made this request, the man would either move to a couch or leave. *Id.* But when Hill asked the man to sit in a chair on January 24, 2020, the man responded by calling Hill a racial slur and telling Hill that he did not have to do what Hill told him to do. *Id.* Hill ignored the slur and again asked the man to sit in a chair instead of the floor. *Id.* The man again refused. *Id.* At that point, Hill "pointed to the door and" told the man he had to leave. *Id.* The man responded by licking Hill's shirt and then "came at [Hill] like he was going to bite [Hill]" before leaving the building. *Id.*

Hill says he told three people about the incident the day it happened, but that "[n]othing was done." *Id.* at PageID.390. Specifically, Hill testified that he told (1) Cherry Hill practice manager Bruce Pilsner,[2] (2) his supervisor Brandon Young, and (3) OSH's divisional growth leader DeMario Trent about the incident. *See id.* at PageID.390, 539. But Young says he was "never told of" the January 24 incident by Hill. *See id.* at PageID.503. And Trent testified that he "never heard of any verbal [or] any physical assaults of [Hill]." *Id.* at PageID.632; *see also id.* at PageID.635

---

[2] Hill testified that *he* reported the incident to Pilsner. *See* ECF No. 46-2 at PageID.390. But in a March 30, 2020 e-mail to OSH's human resources personnel, Hill wrote that a colleague—not Hill—told Bruce about the incident. *See id.* at PageID.539.

- 4 -

(testifying he was not aware that Hill was called a racial slur while working at OSH). There is no testimony from Pilsner in the record.

Hill alleges that because nothing was done, his "motivation and trust at Cherry Hill" was impacted, *id.* at PageID.539, and that if the January 24 incident had been appropriately addressed, his job "performance probably would've been better" in the months that followed, *id.* at PageID.399. Nevertheless, Hill managed to schedule 15 welcome visits for the month of January. *See* ECF No. 46 at PageID.315; *see also* ECF No. 46-2 at PageID.551 (declaring that the chart in OSH's motion for summary judgment reflects figures "collected from OSH's business records" that were provided to Hill during discovery).

Almost three weeks into February 2020, Hill had scheduled only eight new welcome visits for the month—far short of his target number of 17. *See* ECF No. 46-2 at PageID.363–64, 532. So, on February 20, 2020, Hill met with Young to discuss a coaching and remediation plan. *See id.* at PageID.363–64, 532. The "Coaching Documentation" that Young entered regarding the meeting reflected that the two discussed Hill's poor pace to meet the target numbers. *Id.* at PageID.532. Hill explained to Young that he was "scheduling people but they [we]ren't coming in," which was impacting his numbers. *Id.* Young stated that if Hill continued to miss target numbers, Hill would "be looking at more formal corrective action up to and including [t]ermination." *Id.* Young also noted that Hill "stated he needed nothing

from [Young]." *Id.*

By the end of February, Hill had scheduled only 12 welcome visits, *see* ECF No. 46 at PageID.315; so on March 6, 2020, Young issued a "final corrective action" notice to Hill for unsatisfactory performance. ECF No. 46-2 at PageID.534–36. The notice informed Hill that he would be ineligible for a transfer or promotion for six months. *Id.* at PageID.536. Hill acknowledged receipt of the review but noted that he "would like to request a meeting to appeal this decision asap." *Id.* at PageID.534. However, the Parties have submitted no evidence that such a meeting ever occurred. Indeed, a few days later, the COVID-19 pandemic caused unexpected shutdowns, and Hill was placed on furlough[3] by OSH in the weeks that followed. *Id.* at PageID.354.

On March 30, 2020, while Hill was on furlough, he e-mailed Kelly Tabaczynski, an OSH human resources specialist, to appeal his receipt of the final corrective action. *See id.* at PageID.538–39. As part of his appeal, Hill detailed four "situations" that he felt "hindered [him] and other [outreach associates] at Cherry

---

[3] The specifics of OSH's expectations of outreach associates while they were placed on furlough is not entirely clear from the record. While on furlough, OSH employees "continued to receive benefits paid for by [OSH], but" were also eligible to collect unemployment for periods they did not work because of social-distancing guidelines. ECF No. 46-2 at PageID.391–92. Plaintiff testified that outreach associates at OSH on furlough "were still working" by making calls but could collect unemployment for periods they were not able to work because of the pandemic. *Id.* at PageID.392.

Hill from being as successful as they could be." *Id.* at PageID.538. One of those "situations" was the January 24 incident. *See id.* at PageID.539. Plaintiff explained that because of the threat made to him that day by the homeless man and "the lack of response [he] received from leadership," the incident "impacted [his] motivation and trust at Cherry Hill going into the month of February." *Id.* The other three "situations" Plaintiff identified were:

1. Hill being asked to assist moving heavier patients, which decreased the amount of time he has for his own work;

2. OSH providing bad customer service; and

3. Other OSH employees not making their target welcome visit numbers but not receiving discipline.

*See id.* at PageID.538–39.

Tabaczynski responded by e-mail ten days later, thanking Hill for sharing his concerns with her and noting that "a lot of things [were] on hold" while OSH was "trying to navigate through" the pandemic. *Id.* at PageID.542. She asked Hill if he would want to discuss his concerns "a bit more" once everyone was back working in the clinics. *Id.* Hill responded that he "looked forward to reconnecting once things [were] better." *Id.* But there is no evidence that Hill and Tabaczynski ever reconnected to discuss the substance of Hill's e-mail.

In late June 2020—while still furloughed—Hill informed Young that he had applied to the Highland Park OSH location or was "asking to be assigned to one of

the new centers." *Id.* at PageID.544; *see also id.* at PageID.372 (clarifying that the location Hill wanted to transfer to was Highland Park). Young forwarded the message to Tabaczynski, who then forwarded the e-mail thread to Trent, noting that Hill was "the first interest in a new clinic," and that she and Trent should "discuss who to set [Hill] up with." *Id.* at PageID.544.

The COVID-related furlough ended in July 2020, *see id.* at PageID.393, and Hill returned to full-time work with a new job title: outreach executive, *see id.* at PageID.354–55. All outreach associates returned with this new job title, which was created to "combine" tasks of the outreach associates and another position at OSH. *Id.* at PageID.354. Hill says that he was told that because the "outreach executive" was a newly created position, everyone in that position would be "on probation" for the first 90 days. *Id.* at PageID.384–85. Hill also says that it was his understanding that because of this, outreach executives were told that OSH would not make any performance-based terminations until 90 days after furlough. *Id.* at PageID.384–85.

Around the same time Hill returned to full-time work, Trent and another OSH employee, James Bustamante, interviewed Hill for a position at the Woodward OSH Clinic in Highland Park on July 10, 2025. *Id.* at PageID.546. According to Hill, the interview "went very well," and it ended with Bustamante telling Hill that "he would welcome [Hill] over there with open arms." *Id.* at PageID.394. But, according to an e-mail sent by Trent to Tabaczynski, Trent and Bustamante decided not to extend an

- 8 -

offer to Hill. *Id.* at PageID.546.

In early August 2020, Hill declared that he reported concerns "about the hostile work environment, gender discrimination[,] and the unresolved racial incident to Human Resources at the corporate level." ECF No. 51-1 at PageID.701. But there are not many details in the record about such a complaint. Indeed, it is not clear how Hill made these complaints or what specifically these complaints stated. Plaintiff vaguely testified at his deposition that he "escalated [his complaints] up to Treehouse," OSH's corporate human resources, and "went all the way up to Adam Peck and Brian . . . the CEOs and the VPs of the company, and nothing was done." ECF No. 46-2 at PageID.390–91. But the timeline and extent of those complaints are not clear. And OSH asserts that Hill's August 2020 complaint "was a repeat of his January and March 2020 reports of the same, lone [January 24, 2020] incident." ECF No. 53 at PageID.730. Yet neither Hill nor OSH have produced a copy of Plaintiff's alleged August 2020 complaint to OSH's corporate executives or HR department.

On August 14, 2020, Hill met with Young again because he was not on pace to meet his target numbers for August. ECF No. 46-2 at PageID.557. But a few days later, Young was fired and Tiffany Hallum[4] was hired as the new outreach director, becoming Plaintiff's direct supervisor. *Id.* at PageID.385.

---

[4] Hallum is now deceased. *See* ECF No. 46 at PageID.313.

On August 27, 2020, Hallum e-mailed Tabaczynski, Trent, and one other OSH employee requesting authorization to terminate Plaintiff's employment with OSH, citing his consistent failure to meet target numbers, his numerous coaching/remediation documents, and her "previous conversations with our [Human Resources Business Partner] and Divisional Growth Director." *Id.* at PageID.559. Tabaczynski reviewed Hallum's request to ensure that OSH was "following [their] disciplinary process for termination" by checking coaching histories and any written or final warnings in Hill's file. *Id.* at PageID.575. Ultimately, Hallum's termination request was approved, and Hill was fired in early September 2020. *Id.* at PageID.398.

## B. Procedural History

On April 10, 2021, Hill filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) and received a right-to-sue letter eight months later. *See* ECF No. 19 at PageID.114.

On March 30, 2022, Hill sued OSH, alleging that OSH (1) discriminated against him based on race in violation of Title VII and Michigan's Elliott-Larsen Cvil Rights Act (ELCRA); (2) subjected him to a hostile work environment based on sex in violation of Title VII and Michigan's ELCRA; and (3) retaliated against him for reporting race discrimination. ECF No. 1. OSH filed a motion to dismiss Hill's complaint, which was granted in part on June 27, 2023. *See* ECF Nos. 12; 19. After the Court's June 2023 order, only Hill's retaliation claims remained. *See* ECF

No. 19 at PageID.131.

On October 3, 2024, OSH filed the present motion for summary judgment, arguing it is entitled to summary judgment because Hill cannot show any connection between his protected activity and either the denial of his transfer request in July 2020 or his termination in August 2020. ECF No. 46. Hill responded that "[t]he timing and nature of [OSH's] actions toward [Hill] suggest a retaliatory motive" and reiterates the timeline of the facts described above. *See* ECF No. 52 at PageID.716–17. This Court held a hearing on the motion in June 2025. *See* ECF No. 54.

## II. LEGAL STANDARD

To prevail on summary judgment, movants must identify record evidence showing that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a). If so, then the burden shifts to the nonmovant to identify specific facts that create "a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted), which requires more than a mere "scintilla of evidence," *id.* at 251, and more than "metaphysical doubt," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. All inferences must be reasonable, logical, and drawn in the nonmovant's favor to determine

whether any party must prevail as a matter of law. *See id.* at 251–52.

## III. ANALYSIS

The elements of a retaliation claim under Title VII are the same elements required for a retaliation claim under Michigan's ELCRA, so the merits of both of Plaintiff's retaliation claims will be analyzed together. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 627 (6th Cir. 2013) ("The analysis is the same under either act"). If the plaintiff establishes the elements of a prima facie case of retaliation, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Heady v. U.S. Enrichment Corp.*, 146 F. App'x 766, 770 (6th Cir. 2005). If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's reasons for its action were merely pretextual. *Id.*

### A. Plaintiff's Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected activity, (2) that the defendant was aware of the protected activity, (3) that the defendant took an action that was materially adverse to the plaintiff, and (4) that there is a causal connection between the plaintiff's protected activity and the defendant's adverse action. *Jackson v. Genesee Cnty. Rd. Comm'n.*, 999 F.3d 333, 343–44 (6th Cir. 2021).

#### 1. Protected Activity

Although OSH concedes that Hill satisfied this prong of the prima facie case,

there appears to be some confusion between the parties about what specific protected activities give rise to Hill's retaliation claims at issue here. Identifying the specific protected activities relating to Hill's retaliation claims is necessary "to address *when* [Hill] first engaged in a protected activity for the purposes of analyzing causation and pretext." *Moody v. MidMichigan Med. Ctr. Midland*, 704 F. Supp. 3d 772, 781 (E.D. Mich. 2023). Accordingly, a brief analysis regarding this element is necessary.

In his response, Hill appears to allege three protected activities, ECF No. 52 at PageID.716–17: (1) his January 24, 2020 report of the racial harassment by the homeless man; (2) his March 30, 2020 e-mail to Tabaczynski regarding an appeal of the February 2020 corrective action; and (3) his August 2020 report to "corporate HR" about "the hostile work environment, gender discrimination[,] and the unresolved racial incident," ECF No. 52-1 at PageID.724.

Employees engage in a protected activity when they "oppose[] any practice by the employer made unlawful under Title VII" or "participate[] in any manner in an investigation under Title VII." *Johnson v. Univ. of Cin.*, 215 F.3d 561, 578 (6th Cir. 2000) (citation modified). To be protected under the opposition clause, an employee need not file "formal discrimination charges with the EEOC," as "complaints to management and less formal protests of discriminatory employment practices" qualify as opposition. *Laster v. City of Kalamazoo*, 746 F.3d 714, 729–30

(6th Cir. 2014) (citing *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir.2012)).

### a. January 2020 Report

Hill's January 24, 2020 report of racial harassment by the homeless man is not a protected activity for purposes of a retaliation claim. Although Hill's January 24 report opposes an act of racism by a third party, it does not oppose an unlawful employment practice *by OSH*. Thus, Hill did not engage in a protected activity when making the January 24 report. *See Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (concluding that the plaintiff had not engaged in a protected activity under the opposition or participation clause of the ELCRA because he was not opposing conduct of the *employer* but conduct of a colleague).

### b. March 2020 E-mail

Hill's March 30, 2020 e-mail to Tabaczynski explaining his poor job performance is also not a protected activity for purposes of a retaliation claim. Under the opposition clause, "complaints to human resources personnel regarding potential violations of Title VII [may] constitute protected activity." *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012), as amended (Oct. 17, 2012); *see also* ECF No. 46-2 at PageID.538–39. But such complaints must "oppose[] unlawful activity with some specificity, as opposed to merely a 'vague charge of discrimination.'" *Sharp v. Waste Mgmt., Inc.*, 47 F. Supp. 3d 584, 601

(S.D. Ohio 2014), *aff'd sub nom. Sharp v. Profitt*, 674 F. App'x 440 (6th Cir. 2016) (quoting *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013)). True, in the e-mail Hill did discuss the impact the January 24 racial incident had on him, as well as his dissatisfaction with a lack of response to the incident. *See* ECF No. 46-2 at PageID.539. But—importantly—Hill did not allege that the lack of response to the incident was *because* Hill was a member of a protected class. *See id.* (alleging only that "Bruce [Pilsner] felt differently and still allowed [the homeless man] to come in.").

Moreover, Hill himself described the purpose of his March 30 e-mail as follows:

> In Feb[ruary] 2020, I received a second write up in which I would like to appeal by addressing the obstacles encountered, that has hindered myself and other [outreach associates] at Cherry Hill from being as successful as they could be.

*Id.* at PageID.538. In this way, Hill characterizes the substance of his e-mail as complaints about "obstacles" that impacted not only him, but many outreach associates, regardless of their membership in any protected class. *See id.* Indeed, not once does Hill state that any of the four "obstacles" he outlines were obstacles he faced *because* he—or anyone else—was a member of a protected class. *See id.* at PageID.538–39. And "complaints about management practices or decisions rather than discrimination against a protected class are not protected activities under Title VII." *Scheske v. Univ. of Mich. Health Sys.*, 59 F. Supp. 3d 820, 827 (E.D. Mich.

2014) (collecting cases). At bottom, Hill's March 30 e-mail is not a protected activity.

### c. August 2020 Report

Hill's August 2020 report to OSH's corporate officers could be a protected activity if such a report was actually made. Indeed, Hill says that in August 2020, he reported his concerns "about the hostile work environment, gender discrimination[,] and the unresolved racial incident to Human Resources at the corporate level." ECF No. 52-1 at PageID.724. And although OSH appears to acknowledge the existence of an August 2020 complaint in its reply, *see* ECF No. 53 at PageID.730 (characterizing the August 2020 complaint as "a repeat of his January and March 2020 reports of the same, lone [January 2020] incident"), neither Hill nor OSH have produced corroborating evidence of such a complaint.

If, indeed, Hill made a complaint to OSH's corporate officers in August 2020, it sounds as if this complaint *could* constitute protected activity, depending on what specifically Hill alleged in the complaint. But because Hill and OSH vaguely characterize the contents of Hill's August 2020 complaint differently, neither providing evidence of the actual complaint, it appears there is a genuine factual dispute regarding what Hill actually complained about and how he made such a complaint.

Accordingly, because of this factual dispute, Hill's retaliation claims move

forward to the next element of the prima facie analysis, but only to the extent that his retaliation claims are based upon his August 2020 complaint.

### 2. Knowledge

OSH argues that Hill's retaliation claims must fail because Tiffani Hallum, who fired Hill, did not know of Hill's protected activity, and Hill has not produced any evidence sufficient to create a dispute of material fact about whether Hallum knew of Hill's protected activity. ECF No. 46 at PageID.324–25.

As a threshold issue, although OSH asserts that Hallum was the only employee involved in the decision to fire Hill, *see id.*, this assertion is directly contradicted by the record, which shows that Hallum *and* Tabaczynski were involved in the decision to fire Hill. *See* ECF No. 46-2 at PageID.559 (demonstrating Hallum sought permission *from Tabczynski* to fire Hill). Accordingly, the relevant factual inquiry here is whether Hallum or Tabaczynski knew of Hill's August 2020 corporate complaint.

Hill first argues that there is a question of fact whether Hallum and Tabaczynski knew of Hill's protected activity. ECF No. 52 at PageID.712. According to Hill, this is because OSH's "zero-tolerance policy for harassment . . . strongly suggests that management, including those involved in [Hill's] termination would be aware of reports of harassment." *Id.* at PageID.712–13. But there is no record evidence of that policy.

Second, Hill argues that "the facts indicate a genuine dispute regarding who was actually involved in [Hill's] termination," pointing to a fragmented screenshot of deposition testimony from OSH's corporate representative. *Id.* at PageID.713. *See id.* But Hill mischaracterizes the corporate representative's testimony that he relies on. In the (limited) transcript Hill provides, the attorney asks the corporate representative who made the initial decision to fire Hill if Hill's former supervisors were not OSH employees anymore. *Id.* The corporate representative responds that it was "another person." *Id.* The attorney asks if that person was Tiffany. *Id.* The corporate representative responds, "Yes, Tiffany." *Id.* Contrary to Hill's assertion, the corporate representative's statement actually *corroborates* the rest of the record evidence that Hallum and Tabczynski were the decisionmakers. *See* ECF No. 46-2 at PageID.559 (demonstrating Hallum sought permission from Tabczynski to fire Hill).

Yet Hill does not point to a single piece of evidence showing that either Hallum or Tabczynski were aware of Plaintiff's alleged August 2020 complaint to corporate executives and/or corporate HR. *See generally* ECF No. 52 at PageID.713–14. To the contrary, there is affirmative testimony from Tabczynski that she was not aware of any complaints beyond the March 30 e-mail she received from Hill and the prior complaint Hill had made to Pilsner. *See* ECF No. 46-2 at PageID.580–81. And Tabczynski declared that she did not disclose any of those

- 18 -

complaints to Hallum. *Id.* at PageID.551. Similarly, Trent testified that the only complaints from Hill that he knew of were (1) e-mails related to this lawsuit, *id.* at PageID.631; and (2) a complaint about not being allowed to transfer OSH locations, *id.* at PageID.638. Trent also testified that he never disclosed any of those complaints to Hallum. *See id.* at PageID.658.

And even assuming—as Hill argues—that Trent, Young, and "People Experience Business Partner Kierstin Fureigh" were also involved in the decision to terminate Hill's employment, *see* ECF No. 52 at PageID.714, Hill points to no evidence that any of them knew of his alleged August 2020 complaint either,[5] *see generally id.* In this way, there is no question of fact that those who decided to fire Hill did not have knowledge of Hill's alleged protected activity—his August 2020 complaint to corporate executives and HR. Thus, Hill cannot establish a prima facie case, so OSH's motion for summary judgment will be granted, and Hill's case will be dismissed.[6]

---

[5] Although this Court is not required to conduct a free-ranging search for supporting facts, it has indeed searched the entire record, *see* ECF No. 46-2, and there is no evidence that any of these people knew of Hill's alleged August 2020 corporate complaint.

[6] Had Hill identified and pointed to *specific facts* that suggested *anyone* he had identified knew of his August 2020 complaint, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting once the movant identifies record evidence showing no genuine dispute of material fact, the burden then shifts to plaintiff to identify record evidence that create "a genuine issue for trial."), it is likely that Hill's retaliation claims related to his alleged August 2020 report to corporate executives

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 46, is **GRANTED**.

Further, it is **ORDERED** that Counts V and VI of Plaintiff's Complaint, ECF No. 1, are **DISMISSED WITH PREJUDICE**.

**This is a final order and closes the above-captioned case.**

                                                  */s/Susan K. DeClercq*
                                                  SUSAN K. DeCLERCQ
                                                  United States District Judge

Dated: September 30, 2025

---

and HR would have proceeded to trial for the jury to resolve two factual questions: (1) what Hill reported or complained about in his August 2020 report to OSH corporate officers; and (2) whether OSH's explanation for firing Plaintiff in September 2020 was pretextual.